UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

NAUTILUS GROUP, INC.,

          Plaintiff,

  v.

ALLIANZ GLOBAL RISKS US,

          Defendant.

CASE NO. C11-5281BHS

ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANT'S MOTION
FOR JUDGMENT ON THE
PLEADINGS

This matter comes before the Court on Allianz Global Risks US's ("Allianz") motion for judgment on the pleadings (Dkt. 25). The Court has reviewed the briefs filed in support of and in opposition to the motion and the remainder of the file and hereby grants in part and denies in part the motion for the reasons stated herein.

## I. PROCEDURAL HISTORY

On March 18, 2011, Plaintiff Nautilus Group, Inc. ("Nautilus") filed a complaint against Allianz in Clark County Superior Court for the State of Washington. Dkt. 1, Exh. 1 ("Complaint"). Nautilus alleges various causes of action based on Allianz's denial of coverage under an insurance contract. *Id*. On March 13, 2011, Allianz removed the matter to this Court. *Id*.

On December 2, 2011, Allianz filed a motion for judgment on the pleadings arguing that, even if all of the facts alleged in the complaint are assumed to be true, Nautilus has failed to state any cause of action. Dkt. 25. Allianz also filed a stipulation

of facts assumed to be true solely for purposes of Allianz's motion for judgment on the pleadings. Dkt. 24. On January 30, 2012, Nautilus responded. Dkt. 28. On February 3, 2012, Allianz replied. Dkt. 30.

## II. FACTUAL BACKGROUND

### A. The Policy

Allianz issued Nautilus an insurance policy with a policy period from March 31, 2008 to March 31, 2009. Dkt. 24, Exh. A ("Policy"). The Policy "covers all risks of direct physical loss or damage to Insured Property at Insured Location(s)" during the Policy period. *Id*. § II(A)(1). The "Insured" are defined as Nautilus "and its subsidiary," including "legal representatives." *Id*. § I(C). The Policy does not cover "loss resulting from the voluntary parting with title or possession of any property if induced by any fraudulent act or false pretense." *Id*. § II(D)(1)(f). The Policy also does not "cover loss or damages directly or indirectly caused by or resulting from . . . any dishonest act, including but not limited to theft . . . by the Insured or any . . . officer or employee . . . ." *Id*. § II(D)(2)(d). The Policy, however, does "cover acts of direct physical loss or damage . . . intentionally caused by an employee of the Insured . . . and done without knowledge of the Insured." *Id*.

### B. The Termination

In 2008, Nautilus conducted business operations in China through a subsidiary, Nautilus Fitness Shanghai ("Nautilus Shanghai"). Complaint, ¶ 8. Prior to November 20, 2008, Xu Xiaobin ("Mr. Xu"), a Chinese citizen and resident, was the highest ranking employee of Nautilus Shanghai, serving as its Legal Representative and Managing Director. Dkt. 24, Exh. B at 112. Mr. Xu reported directly to Tracy Maloney ("Mr. Maloney"), the Nautilus U.S. Vice President of Sales for Asia Pacific and Latin America. *Id*.

In November 2008, in response to concerns about Mr. Xu's conduct and his violation of Nautilus's policies and protocol, Nautilus decided to terminate his employment. Complaint, ¶ 10. Mr. Maloney was dispatched to Shanghai to inform Mr. Xu of the decision. Dkt. 24, Exh. B at 11. Mr. Maloney and Carol Tsui, office manager for Nautilus Shanghai, met with Mr. Xu at the Nautilus Shanghai offices on the morning of November 20, 2008 to inform him that because of his actions "it was probably best that a change be made and that Xu and Nautilus part ways." *Id*. at 13. Mr. Maloney also informed Mr. Xu that Nautilus "was willing to negotiate an appropriate severance package for him as well as assist him in moving on to other employment." *Id*. Mr. Xu responded by contending that Nautilus did not have the right to relieve him of his duties. *Id*.

After the November 20 discussion Mr. Xu continued to come to the office daily, and he instructed the Nautilus Shanghai employees to adhere to his instructions and ignore any instructions from the Nautilus officials. *Id*. This continued for approximately one week, during which time Mr. Maloney "attempted to negotiate appropriate severance terms with Mr. Xu to effect his transition from employment," but Mr. Xu rejected all offers and asserted that he would remain as the Nautilus Shanghai Legal Representative and Managing Director. *Id*.

When Mr. Maloney informed Mr. Xu of the decision to terminate his employment and negotiate a severance package, he also explained that Nautilus intended to effect "a smooth transition of functions and responsibilities to other Nautilus Shanghai employees," all as part of a professional parting with Mr. Xu. *Id*. at 16. That plan, however, was not successful because Mr. Xu embarked on an increasingly hostile and disruptive course of conduct, which "became apparent in the first few weeks after" Mr. Maloney met with him on November 20, 2008. *Id*.

In the last week of November 2008, Mr. Xu informed the Nautilus officials that he was planning to take a vacation. *Id*. at 13. He was then absent from the office for several days. *Id*. at 13-14. During Mr. Xu's absence, Nautilus officials retained security guards to keep Mr. Xu from returning to the office. *Id*. at 13. Mr. Xu, however, returned on December 4, 2008 with his own security detail, which overpowered the security personnel retained by Nautilus and took control of the office. *Id*. at 14. The Nautilus officials contacted the local police, but after visiting the scene and listening to both sides, they declined to get involved in what they said they viewed as an employment dispute. *Id*. Nautilus then withdrew its security team and allowed Mr. Xu to return to the office. *Id*.

Mr. Maloney remained in Shanghai and continued to negotiate severance terms with Mr. Xu and Mr. Xu's personal attorney until December 19, 2008. *Id*. at 14. Mr. Maloney was scheduled to return to the U.S. on December 20, 2008. *Id*. Unable to consummate a severance agreement with Mr. Xu, Mr. Maloney told all Nautilus Shanghai employees that they were relieved of their duties (although they remained on the payroll at that point), and Mr. Maloney flew back to the U.S. as scheduled. *Id*.

Nautilus and Mr. Xu engaged in litigation in China related to Mr. Xu's employment and termination. *See* Dkt. No. 24, Exh. C. The Shanghai Pudong District Court determined that Mr. Xu's termination date was December 10, 2008, and the Court ruled that Mr. Xu should receive his salary through that date since he was notified of the termination on that date. *Id*. at 3.

## C. The Property

Mr. Xu kept certain corporate documents in his private office, including the business license and "chop" or company seal which were kept in Mr. Xu's private office.[1]

---

[1] A "chop" is an individualized, carved ink stamp which is used to identify the holder, which, like a business license, is necessary to conduct business and financial transactions in China. Complaint, ¶ 17

*Id.*, Exh. B at 16. Mr. Xu also had possession of certain contracts and sales related documents. *Id.* Between November 20 and December 19, 2008, Mr. Maloney attempted to regain possession of the business license, chop and other missing documents and items. *Id.* at 14. Mr. Xu acknowledged that he had the items in his possession, but he refused to provide them to Mr. Maloney, indicating that if the parties resolved their differences he would return them. *Id.*

In early January 2009, Mr. Maloney's immediate supervisor, Timothy Joyce (Senior Vice President of Global Sales) flew to Shanghai to try to reach an agreement with Mr. Xu on the terms of a severance agreement in exchange for Mr. Xu returning the chop, business license and other items. *Id.* at 14-15. Mr. Joyce believed he had reached such an agreement with Mr. Xu on or about January 7, 2009, but Mr. Xu then changed his demands at what Mr. Joyce believed would be their final meeting. *Id.* at 15. In addition, Mr. Xu claimed that he had forgotten to bring the license and chop to the meeting. *Id.* Mr. Joyce returned to the U.S. and Nautilus instructed counsel in China to proceed with plans to dissolve the company and pursue the issuance of a new license and chop. *Id.* at 15; *id.*, Exh. 25.

According to Nautilus the loss of the chop and business license rendered Nautilus unable to conduct business in China. Complaint, ¶ 20. Accordingly, the Nautilus Shanghai employees were laid off, although they remained on the payroll. Dkt. 24, Exh. B at 14. In addition, Nautilus had to undertake formal procedures through Chinese government agencies and the Chinese legal system to remove Mr. Xu as its Legal Representative and Managing Director and to have a new chop and license issued. Complaint, ¶¶ 21-23. The formal procedures required Nautilus to apply to the Shanghai Administration of Industry and Commerce, Pudong New Area Branch ("Pudong AIC"). *Id.*, ¶ 23. Nautilus made its application on February 18, 2009. *Id.* The new registration

was granted on June 10, 2009, and upon receiving it, Nautilus requested a new business license which was issued on September 10, 2009. Complaint, ¶¶ 23-24.

**D.     The Claim**

On October 1, 2012, Nautilus made a claim under the insurance policy. Dkt. 24, Exh. B. The insurance claim consists of the following components:

```
Uncollected Accounts Receivable $1,400,000
Employee Severance Costs $ 33,061
Travel Expenses $ 17,189
Legal Expenses $ 360,120
TOTAL $1,810,3706
```

*Id*. at 9; *id*., Exhs. 17-19.

With respect to the accounts receivable claim, Nautilus contends that as of November 2008 Nautilus Shanghai had accounts receivable totaling $1,862,000. *Id*., Exh. B at 10. Of that amount, it had reserved $373,000 as bad debt, although it intended to pursue collection of those sums. *Id*. For the 4th quarter of 2008, Nautilus recognized certain charges on its 10-K related to the shut down of operations in Shanghai, including $1.49 million for uncollectible accounts receivable. *Id*. Nonetheless, it was able to collect $413,000 of the Shanghai accounts receivable in 2009 and 2010, after taking this charge. *Id*. at 10. Nautilus contends that the effort to collect further amounts has been increasingly difficult due to the absence of supporting documentation, namely the contracts and supporting documents Mr. Xu refused to return, as well as the passage of time. *Id*.

Nautilus arrived at its claimed $1.4 million accounts receivable figure by: (1) subtracting the $413,000 recovered in 2009 and 2010 from the $1.49 million charge it recognized on its 10-K for 2008 (which equals $1,077,000); (2) adding back most of the $373,000 in "bad debt" it was carrying in late 2008 based on the contention that if Mr. Xu had not removed the contracts and other documents some portion of that bad debt would have been recovered; and (3) rounding the claim to $1.4 million. *Id*.

The employee severance costs represent payroll issued to the Nautilus Shanghai staff after operations were terminated in December 2008. *Id*. at 8-9. The travel expenses relate to the trips to Shanghai by Nautilus's U.S. employees to meet with Mr. Xu in late 2008 and early 2009, and subsequent trips to meet with the company's Chinese legal counsel and deal with the efforts to obtain the new registration, license, and seal. *Id*. at 9. The legal expenses relate to the work performed by Nautilus's legal counsel to obtain the new business license, chop and other documents necessary to resume operations and for certain litigation with Mr. Xu related to the disputes between Xu and Nautilus. *Id*. at 9.

### III. DISCUSSION

**A.   Standard**

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1990). "Judgment may only be granted when the pleadings show that it is beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co., Ltd.*, 132 F.3d 526, 529 (9th Cir. 1997).

**B.   Applicable Contract Law**

Both parties agree that Washington law applies to the interpretation, construction, and application of the insurance contract. Dkt. 25 at 9, n. 7; Dkt. 28 at 6. In Washington, whether an insurer has an obligation to its insured under the insurance contract can be determined as a matter of law. *Petersen-Gonzalez v. Garcia*, 120 Wn. App. 624, 630 (2004). Washington courts examine the terms of an insurance contract to determine whether under the plain meaning of the contract there is coverage. *Boeing Co. v.*

*Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 876 (1990). Courts interpret insurance policies as a whole and give them a fair, reasonable, and sensible construction as an average person purchasing insurance would understand them. *Capelouto v. Valley Forge Ins. Co.*, 98 Wn. App. 7, 13 (1999). If terms are defined in a policy, then the terms should be interpreted in accordance with that policy definition. *Kitsap County v. Allstate Ins. Co.*, 136 Wn.2d 567, 576 (1998). Undefined terms, however, must be given their "plain, ordinary, and popular" meaning. *Boeing*, 113 Wn.2d at 877 (citations omitted).

**C.    Allianz's Motion**

Allianz argues that there is no coverage under the insurance contract because (1) the damage claim is excluded by the "dishonest acts" of the insured or an employee exclusion; (2) the damage claim is excluded by the "voluntary parting" exclusion; (3) no coverage exists for any category of Nautilus's claimed damages. Dkt. 25 at 11-25.

**1.    Employment Status**

In this case, Allianz argues that Mr. Xu was an "insured" and a Nautilus employee when the misappropriation of the Property occurred. Dkt. 25 at 11-12. Allianz concludes that the Policy specifically excludes dishonest acts of either the insured or its employees. *Id.* First, the Policy defines the "insured" to include Nautilus's "legal representatives." Policy, § I(C). The term "legal representative" is undefined and must be given its plain, ordinary, and popular meaning. *Boeing*, 113 Wn.2d at 877. The Court finds that an average person purchasing insurance would construe the term to mean more than the retention of a title in a foreign government's business registration system. An average person would consider legal representation to be within the person's control and end at least when the person formally announced the cessation of representation. Nautilus has submitted evidence that it formally removed Mr. Xu as its legal representative on November 20, 2008. Dkt. 24, Exh. 1 at 18-20. Therefore, the Court denies Allianz's

motion on this issue because Nautilus can prove at least one set of facts that Mr. Xu was not an "insured" under the Policy.

Second, construing the facts in Nautilus's favor shows that Nautilus can prove a set of facts that Mr. Xu was also not an employee under the Policy. Nautilus formally announced Mr. Xu's employment with the company was terminated on November 20, 2008. Dkt. 24, Exh. 1 at 18-20. Moreover, it is unclear when Mr. Xu removed the Property from the Nautilus office. Nautilus contends it was after receiving notice of his termination at approximately 10:00 am on November 20, 2008. Dkt. 28 at 5; Dkt. 24, Exh. B at 11. Mr. Xu did access the office by force and without intervention by the local authorities after the date Nautilus claims he was terminated. This is a set of facts which could possibly show that Mr. Xu misappropriated the Property after he was terminated.

With regard to the Shanghai court's finding that Mr. Xu's termination date was December 10, 2008, the finding of fact is neither binding nor subject to preclusion by collateral estoppel. While the fact-finder in this proceeding may ultimately agree that Mr. Xu was terminated on December 10, 2008, such a finding is beyond the standard for the instant motion. Therefore, the Court denies Allianz's motion on the issue of whether the dishonest acts of an employee exclusion applies to Nautilus's claim.

### 2. Voluntary Parting

The Policy does not cover "loss resulting from the voluntary parting with title or possession of any property if induced by any fraudulent act or false pretense." *Id*. § II(D)(1)(f). Allianz argues that the "exclusion clearly applies when – as here – an employee is entrusted with the possession of company property and misappropriates that property." Dkt. 25 at 17. Nautilus counters that "no fraudulent act or false pretense was involved in [Mr.] Xu's ultimate taking of the Property after he was terminated on November 20, 2008." Dkt. 28 at 13. The Court agrees, as there are facts that show that Mr. Xu "absconded with the Property without Nautilus's consent or authorization." *See*

Dkt. 28 at 13; Dkt. 24, Exh. B at 13-15. Therefore, the Court denies Allianz's motion on the issue of whether the voluntary parting exclusion bars any sets of facts that Nautilus may prove.

### 3. Accounts Receivable

The Policy covers "any shortage in the collection of accounts receivable resulting from physical loss . . . to the Insured's accounts receivable records . . . ." Policy § II(E)(4)(a). Allianz argues that Nautilus's accounts receivable records are intact and Nautilus is unable to recover the money owed because it does not have sufficient supporting documentation to prove that the business relationships actually existed or occurred. Dkt. 25 at 22-24. Nautilus does not contest the state of its business records, but counters by arguing that the phrase "accounts receivable records" is ambiguous and that the Court should construe the phrase in favor of coverage. Dkt. 28 at 15-17.

A policy provision is ambiguous when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable. *Washington Restaurant Corp. v. General Ins. Co. of America*, 64 Wn.2d 150 (1964). "[W]here the clause in the policy is ambiguous, a meaning and construction most favorable to the insured must be applied . . . ." *Morgan v. Prudential Ins. Co. of America*, 86 Wn.2d 432, 435 (1976).

In this case, the Court finds that the phrase "accounts receivable records" is ambiguous because it is fairly susceptible to two reasonable interpretations. First, it is reasonable to interpret the phrase to mean a single document or other record that simply lists the accounts receivable. Allianz's position is based on this interpretation. Dkt. 25 at 22-23.

On the other hand, it is also reasonable to interpret the phrase to mean the records of each individual account receivable as argued by Nautilus. This interpretation is enforced by the opening language of the provision, which evidences a concern in the

shortage of the collection of debts. Moreover, the term "records" is plural, which supports an interpretation of multiple documents relating to each account receivable.

Therefore, the Court denies Allianz's motion on this issue because the insurance contract covers the loss alleged by Nautilus.

**4.    Physical Loss**

Allianz argues that Nautilus must show "direct physical loss or damage to" covered property to state a valid claim and that this "requires proof that the property at issue has been physically altered." Dkt. 25 at 19. Allianz even contends that "a 'theft' or misappropriation of property cannot constitute 'physical loss or damage.'" *Id*. at 22. The nonbinding case law cited by Allianz does not stand for this extremely narrow interpretation of the grant of coverage. With regard to the binding law on this issue, Allianz cites *Wolstein v. Yorkshire Ins. Co., Ltd.*, 97 Wn. App. 201 (1999) and *Fujii v. State Farm Fire & Cas. Co.* 71 Wn. App. 248 (1993). In *Wolstein*, the court adopted a conclusion from the Fifth Circuit Court of Appeals that "[t]he language 'physical loss or damage' strongly implies that there was an initial satisfactory state that was changed by some external event into an unsatisfactory state [.]" *Wolstein*, 97 Wn. App. at 213. The Court relied on this altered "state" logic in concluding that damages for delay in repair to covered property was not a covered loss. *Id*. The instant case is factually distinguishable because Nautilus alleges that the covered property was physically lost. On this issue, the *Wolstein* court stated that "the insured object must sustain actual damage or be physically lost to invoke . . . coverage." *Id*. at 212. Therefore, the *Wolstein* case does not support Allianz's position.

In *Fuji*, the court found that there was no physical loss to the covered "dwelling" when a landslide caused nearby soil destabilization. *Fujii*, 71 Wn. App. at 251. The court stated that "[w]hile there was agreement that such damage was likely to occur in the near future unless expensive preventative measures were taken, each professional

ORDER - 11

concluded that no physical damage had yet occurred." *Id*. at 249. While this case may have been applicable if Mr. Xu had conveyed that he was likely to steal or misappropriate the Property, it is factually distinguishable and inapplicable to the alleged facts.

With regard to the Policy, at least two portions support Nautilus's position that there is coverage for its alleged loss of the Property. First, if "physical loss" was interpreted to mean "damage," then one or the other would be superfluous. The fact that they are both included in the grant of coverage evidences an understanding that physical loss means something other than damage. Second, the Policy contains an exclusion for an employee's theft of covered property. If theft was not a covered risk, then this provision would be unnecessary. Therefore, the Court finds that a reasonable person purchasing insurance would understand the contract to cover theft of covered personal property as "physical loss," and the Court denies Allianz's motion on this issue.

### 5. Other Expenses

Nautilus made a claim for employee severance costs, travel expenses, and legal expenses. Allianz argues that these categories of loss are not covered by the Policy because the "Expediting Expenses" provision only covers expenses relating to actual physical "damage" to property. Dkt. 25 at 24. Nautilus failed to respond to this portion of Allianz's motion, an act which the Court may consider as an admission that Allianz's motion has merit. Local Rule CR 7(b)(2). Therefore, the Court grants Allianz's motion on this issue because (1) Nautilus failed to respond and (2) the policy provision refers to physical "damage."

### 6. Sublimit

Allianz contends that the covered losses be capped at the "Miscellaneous Unnamed Location" sublimit. Dkt. 25 at 25. Nautilus failed to respond to this portion of Allian'z motion, and the Court considers that an admission. Local Rule CR 7(b)(2). Therefore, the Court grants Allianz's motion on this issue because (1) Nautilus failed to

ORDER - 12

respond and (2) the Court has not been presented with any facts that show that Shanghai was not a Miscellaneous Unnamed Location.

## IV.  ORDER

Therefore, it is hereby **ORDERED** that Allianz's motion for judgment on the pleading (Dkt. 25) is **GRANTED in part** and **DENIED in part** as set forth herein.  The parties shall file a Joint Status Report as set forth in Dkt. 6 no later than April 8, 2012.

DATED this 8th day of March, 2012.

BENJAMIN H. SETTLE
United States District Judge